Nov. Term,
1859.

McQUIGG
v.
McQUIGG.

Monday,
December 5.

- - -

McQUIGG *v.* McQUIGG.

The policy of our law is against disturbing divorces granted.

The common-law right to set aside a judgment of a superior Court by bill in chancery, for fraud, or by complaint in the nature of such a bill, was entirely superseded by the various provisions of our code for the vacation of judgments. The statutory mode must be resorted to.

Thus, judgments of divorce can only be set aside upon a motion for a new trial, made within the time allowed therefor.

APPEAL from the *Marion* Circuit Court.

PERKINS, J.—In *January*, 1854, *Edmund H. McQuigg*

filed his complaint in the *Marion* Circuit Court, praying a divorce from his wife, *Eliza Jane McQuigg*.

On affidavit of non-residence, notice was given by publication. In *May* following, the divorce was granted.

In *August*, 1857, said *Eliza Jane* filed her complaint in said *Marion* Circuit Court, praying that the judgment of divorce be vacated, set aside, and held for naught, on the ground of fraud in obtaining it. Trial, and judgment vacating the judgment of divorce.

The code provides as follows:

"Sec. 43. Parties against whom a judgment has been rendered without other notice than the publication in the newspaper herein required, except in cases of divorce, may, at any time within five years after the rendition of the judgment, have the same opened, and be allowed to defend.

"Sec. 44. But before any judgment shall be opened, such party shall give notice to the original complainant, or his heirs, devisees, executors, or administrators, of his intention to make application to have the judgment opened, as the Court, in term, or the judge thereof, in vacation, shall require; and shall file a full answer to the original complaint, and an affidavit stating that during the pendency of the action, he received no actual notice thereof, in time to appear in Court and object to the judgment, and shall also pay all such costs of the action as the Court shall direct." 2 R. S. p. 37.

The code further provides that "no complaint shall be filed for a review of a judgment of divorce." 2 R. S. p. 165, § 586.

The statute of 1859, on the subject of divorce, contains a like provision. Acts of 1859, p. 109.

This Court held that judgments of divorce could not be set aside under the code of 1843. *McJunkin* v. *McJunkin*, 3 Ind. R. 30.

The policy of our state seems to have been, and to still be, against disturbing divorces granted. This has been induced by a consideration of the consequences necessarily incident to an opposite policy. This case affords an

illustration. Within the three years between the granting of the divorce, and the setting of it aside, *Edmund H. Mc-Quigg* had married another woman.

In *Woolley* v. *Woolley*, 12 Ind. R. 663, a doubt was expressed whether the common-law right to set aside a judgment of a superior Court by bill in chancery for fraud, or by a complaint in the nature of such a bill, had not been superseded entirely by the various provisions enacted into our code of practice, under which judgments may be vacated. Further reflection has confirmed us in the opinion that such is the fact, and that the statutory modes must be resorted to.

This being the case, it follows that judgments of divorce can only be set aside upon a motion for a new trial, made within the time allowed therefor, and that the suit in the case now before us cannot be maintained.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c.

*T. D.* and *R. L. Walpole* and *K. Ferguson*, for the appellant (1).

*L. Barbour* and *J. D. Howland*, for the appellee (2).

(1) Counsel for the appellant argued, in substance, as follows:

The question which comes up upon the overruling of the demurrer, the motion for new trial, the motion in arrest, and the motion for judgment in appellant's favor, may be stated thus: Has the Circuit Court the power to set aside and annul a judgment of divorce previously pronounced and entered, where that Court had jurisdiction of the subject-matter, and the parties before it, in a manner prescribed by law? if so, can it be done in the manner sought by the proceedings in the case at bar?

The subject-matter of the case—the judgment in which is sought to be set aside—was, as this Court will see, a proceeding in divorce for statutory causes, of which the Circuit Courts of this state have jurisdiction. Then, had the Circuit Court jurisdiction of the person of the complainant and defendant, in that proceeding before it, in the manner required and authorized by law, without saying anything in reference to the presumption on the point of jurisdiction, as evidenced by the finding and decree of the Court, sought to be set aside by this proceeding.

We maintain, that under our statute, the question of the residence of every applicant for divorce is, so to speak, a condition precedent to the judgment granting a divorce, of which fact the Circuit Court must be satisfied, and is necessarily compelled to pass upon, in every application for divorce, before the granting thereof. 2 R. S. p. 234, § 6. If, then, this view be right, we suggest that the Circuit Court could not open the question of whether the applicant

was a *bona fide* resident, when his complaint was filed and judgment of divorce granted; particularly could it not do so in the direct manner sought by the proceedings in the Court below; for if the question of residence of the applicant was involved in the suit for divorce, and the Circuit Court was necessarily compelled to and did pass on the question of the residence of the applicant, before giving the judgment of divorce, then we submit that it follows that the Circuit Court could not again inquire into the question, as was done in the proceedings in this case. The question of residence of the applicant, like the causes for divorce, had to be proved on the trial, to the satisfaction of the Court, and the judgment in divorce for the applicant, is evidence that proof of residence was made; and we submit, where the question of residence was involved in and necessarily passed upon by the Court, as it must be in every application for divorce, whether it is not conclusive between the parties. That this question of residence of the applicant was before the Circuit Court at the granting and giving of the judgment of divorce, is evidenced by the affidavit of the applicant, and the action of the Court. Then the Court was satisfied, when giving the judgment of divorce, from the evidence in the case, of its jurisdiction of the person of the appellant, and the subject-matter of his complaint. Now was the appellee in Court? The judgment recites that proof had been duly made to the Court that the appellee was notified by publication for more than thirty days before the first day of term, &c.; and the evidence showed that the appellee was notified as required by statute, for more than thirty days before the first day of the term of the Court at which the judgment of divorce was given.

The Court having then passed on the question of the jurisdiction of the parties, having the question before it, and having jurisdiction of the subject-matter of the action and the parties to the action in Court, by notice as by law required, we submit whether it is in the power of the Court to review the the same questions, as sought by the proceedings in this case. That the legislature of *Indiana* intended to close the door against the review of judgments of divorce, we think is evident. 2 R. S. p. 165, § 586. This section, prohibiting, as it does in terms, the filing of a complaint to review a judgment of divorce, needs no construction. It means what by its terms it says, or it means nothing.

That such was the intention of the legislature, is manifest from the fact that they made it the duty of the prosecuting attorney of every circuit, where a petition for divorce remained undefended, to appear and resist such petition. 2 R. S. p. 238, § 27. Here we think that by the several provisions of the statute referred to, the legislature intended that when a judgment of divorce was once rendered, no complaint to review that judgment should be filed. Whether this provision of the statute is wise, enlightened legislation, is a matter we are not called upon to discuss. It is sufficient for us to know that such is the act of our legislature.

Many good reasons might be assigned in support of the action of the legislature in prohibiting the review of judgments for divorce; such as the protection of subsequent marriages of divorcees, and consequences following the setting aside judgments of divorce where this relation exists. The case at bar is in point. Here, some two years after the judgment of divorce was granted, the record shows the appellant married again. We think the legislature intended by our statute to prohibit such consequences. Why should the legis-

lature have so provided, if the intention was not such as we suggest? There was nothing prohibiting the review of decrees of divorce prior to the statute referred to. Decrees of divorce, like other decrees of Courts, were the subject of review on the showing of a proper cause; and our legislature has, by the statute referred to, provided for the opening and review of all classes of judgments and decrees except judgments of divorce. Why except this class of cases?

If, then, the suggestion here made is correct, we submit that it follows that the Circuit Court erred in overruling the demurrer, the motion for a new trial, the motion in arrest, and the motion for judgment in appellant's favor.

＊        ＊        ＊        ＊        ＊        ＊        ＊        ＊        ＊

The next error committed by the Circuit Court, is contained in the Court's charge to the jury. The principal objection is, to the matter contained in the twelfth paragraph of the charge, where the Court tells the jury that they may attach to the affidavit of appellant such weight as they deem it entitled to. Now our statute declares such affidavit shall be *prima facie* evidence of the *bona fide* residence of such applicant. 2 R. S. p. 234, § 6. The charge here assumes that the jury may attach less, if they deem it right, than that which the statute declares. We suggest that the jury should have been told that they could not attach less weight to the affidavit of appellant than that of *prima facie* evidence of residence. The subsequent paragraph of the charge, where the Court say such affidavit is *prima facie* evidence of residence, rendered the charge contradictory in terms, and calculated to mislead the jury as to the weight and effect of the affidavit.

＊        ＊        ＊        ＊        ＊        ＊        ＊        ＊        ＊

The Court erred in refusing the charge asked for by appellant. In the charge given to the jury, this Court will see that the Circuit Court makes domicil necessary to residence, and so interwoven that residence could not exist without it. The charge asked and refused, assumes that domicil and residence are not so necessarily connected, but that one may be a *bona fide* resident of one place, and may have a domicil in another. On this point, see *Frost* v. *Dickinson*, 19 Wend. 11. In this case, the Court holds that a person may be a *bona fide* resident of one state and have a domicil in another.

(2) The argument of counsel for the appellee is inserted entire.

The plaintiff in the Court below, who is appellee in this Court, filed her complaint, alleging her marriage with the defendant on the 16th of *May*, 1839; that they lived together until 1846, when a separation took place; that on the 4th of *January*, 1844, the defendant filed his petition for a divorce from her, in the *Marion* Circuit Court, caused a notice of its pendency to be published, and on the 14th of *May* following obtained a decree of divorce; that the defendant, at the time of filing his petition, was a resident of *Tioga* county, *New York*, and was never a *bona fide* resident of *Marion* county, *Indiana*, but continued his residence in *New York* during the pendency of the divorce proceedings, and made a temporary sojourn in *Indiana* for the sole purpose of obtaining a divorce, and with the intention of returning to *New York*, so soon as he should succeed; for which reason, she insists, the proceeding was fraudulent, and prays that the decree of divorce may be annulled for fraud.

The defendant was served personally, appeared to the action, and put in a demurrer to the complaint, which was overruled. The cause went to trial

upon an issue of fact, and under special instructions the jury found that the defendant was not a *bona fide* resident of this state when the petition for divorce was filed, nor when the divorce was decreed. Motion for a new trial overruled, and judgment on the verdict, vacating the decree of divorce, as having been obtained through fraud practised by the defendant.

The pleadings and evidence contain a variety of allegations and testimony, which, under the theory of the case assumed by the plaintiff and adopted by the Circuit Court, are immaterial and irrelevant; the only issue submitted to the jury was the residence or non-residence of the defendant. That really is the question in the case. Was *McQuigg*, when he applied for and obtained his divorce, a *bona fide* resident of the state? If he was not, what are the consequences? Do they, or not, affect the judgment of divorce? And how is it affected?

This is really the important question in the cause. It is presented in various forms—upon demurrer to the complaint—upon the trial of the merits—upon motion for new trial—upon motion for judgment *non obstante veredicto*—upon motion in arrest of judgment. It is still the same. We, therefore, propose to encounter, and, if we can, dispose of it at once, leaving the minor questions, of which there are several, to the brief space that becomes their merits.

We assume the position that "fraud will vitiate any, even the most solemn transactions," and that "when once it is satisfactorily established, it overthrows all their sanctity, and destroys them as proof." *The United States* v. *The Amistad*, 15 Pet. 518. This rule is applicable as well to judgments as to any other transactions of a solemn character. Fraud cuts to the very bone, and utterly subverts whatever is built upon it. This being a direct proceeding to assail a judgment for fraud in its procurement, we are not embarrassed by any questions upon the effect of collateral attacks upon fraud. We have met this judgment face to face. We have, as we shall hereafter show to the satisfaction of the Court, fully proved that it is based upon a fraud—a fraud by which, upon a jurisdiction falsely imputed to the Court, the Court was misled and imposed upon; a fraud, therefore, upon the rights of the plaintiff, and upon the tribunals of justice. If this be so, we insist, that in a direct suit to vacate it, the judgment is a nullity. 1 Story's Eq. Juris., p. 252.—*Bruner* v. *Manville*, 2 Blackf. 485.—*Platt* v. *Judson*, 3 *id.* 235.—1 Madd. Ch. R. 236.—*Reigal* v. *Wood*, 1 Johns. Ch. 402. "Equity has so great an abhorrence of fraud, that it will set aside its own decrees if founded thereupon." Vin. Abr. 543. "Although the judgment of a Court of competent jurisdiction, upon the same subject-matter, will, in general, be conclusive between the same parties, yet such a judgment may be impeached on the ground of fraud; for 'fraud,' in the language of DE GREY, Ch. J., 'is an extrinsic collateral act, which vitiates the most solemn proceedings of Courts of justice. Lord COKE says it avoids all judicial acts, ecclesiastical or temporal.' And in a recent case before the House of Lords, it was observed, that the validity of a decree of a Court of competent jurisdiction, upon parties legally before it, may be questioned, on the ground that 'it was pronounced through fraud, contrivance, or covin of any description, or not, in a real suit, or if pronounced in a real substantial suit, between parties who were really not in contest with each other.' We may add, that, if a judgment be obtained in a superior Court clandestinely, by abuse of its forms, and by deceiving its officers, the defend-

ant against whom it is sought to enforce such judgment, may obtain a speedy remedy by applying to have it set aside, and the offender punished by attachment." Broome's Leg. Max. 254.—*Cline* v. *Murrell*, 9 Ind. R. 516.—Fonbl. Eq. 27, 642.

The statute provides that "divorces may be decreed by the Circuit Courts of this state on petition filed by any person at the time a *bona fide* resident of the county in which the same is filed." 2 R. S. p. 234, § 6.

Our ground is this—that *McQuigg* never was a resident in good faith; that he falsely assumed a color of residence, and thereby imposed upon the Court; that this fraud and want of jurisdiction are things properly open to examination in a suit for that purpose; that a judgment thus procured, in a divorce proceeding, as in any other action, is void, and will be so declared upon proper allegations and proofs.

It is strenuously urged, in every variety of form, that the principle insisted on is not, under our statute, applicable to judgments of divorce. Why not? Can it be conceived that the legislature have ever adopted provisions so subversive of morals as to make a judgment of divorce fraud-proof? Before the Supreme Court can be brought to so melancholy a conclusion, they will require language so explicit as to leave no room for a construction favorable to honor and truth. They will not dishonor public justice by making it the plaything of imposters. What, then, are these provisions so discreditable to the state? We have, under the code, general provisions securing to the citizen all remedies heretofore existing. "The laws and usages of this state relative to pleadings and practice in civil actions and proceedings, not inconsistent herewith, and as far as the same may operate in aid hereof, or to supply any omitted case, are hereby continued in force." And, "all rights of action secured by existing laws, may be prosecuted in the manner provided in this act." 2 R. S. p. 224, §§ 802, 803.

The provisions relied upon by the appellant are to be found in the 2 R. S. pp. 37, 165, §§ 43, 586. The first is in these words: "Parties against whom a judgment has been rendered without other notice than the publication in the newspaper herein required, except in cases of divorce, may, at any time within five years after the rendition of the judgment, have the same opened, and be allowed to defend." The second reads thus: "Any person who is a party to any judgment, or the heirs, devisees, or personal representatives of a deceased party, may file in the Court where such judgment is rendered, a complaint for a review of the proceedings and judgment at any time within three years next after the rendition thereof. Any person under legal disabilities, may file such complaint at any time within three years after the disability is removed. But no complaint shall be filed for a review of a judgment of divorce."

Here are two modes of relief afforded the citizen, each of which is expressly denied in cases of judgments of divorce. One is "opening the judgment;" the other, "a proceeding to review judgments."

The first of these proceedings is in the nature of a new trial, and is analogous to the setting aside a default and permitting the party against whom a judgment has been rendered to put in appearance and plead to the action. It is a privilege, in favor of such a party, almost without restriction. If judgment has been rendered against him, without other notice than the publication in a newspaper, he has five years within which, after notice to the original plaintiff, full answer to the original complaint, and affidavit of the want of ac-

tual notice, the Court, on his motion and payment of costs, will allow him to defend. He must answer, and furnish proofs, if necessary; in short, it is the trial, upon issue joined and the production of proofs, of a cause once adjudged for the want of defense. It is a proceeding which, from its very nature, admits the existence of a valid judgment, and seeks to escape its binding obligation, not by impeaching it for fraud, and denouncing it as void, but by alleging the want of actual notice, as an excuse for not having defended it, and seeking to show that such facts exist as will, on a new trial, produce a different result. It is such a feature as exists in the *New York* code, in cases of constructive notice, when the "defendant may apply to the Court, within one year after he has received notice of the judgment, but not after the expiration of seven years from its rendition, for liberty to defend the action; and the Court may allow him to do so, upon such terms as are just." 1 Monell's Pr. 493.

The review is at the command of either party, upon complaint filed, alleging errors of law appearing in the proceedings or judgment, or material new matter, discovered since the rendition thereof, or for both causes, without leave of Court. Notice is given, issues of law and fact are formed, and judgment rendered affirming, or reversing, or suitably modifying the original judgment. This provision, made since the blending of law and chancery proceedings into one system, is designed to take the place of the bill of review, and a bill for a new trial, in actions at law. "A bill of review may be had upon apparent error in judgment, appearing on the face of the decree; or by special leave of the Court, upon oath made of the discovery of new matter or evidence, which could not possibly be had or used at the time when the decree passed." 3 Blacks. Comm. 454.—Story's Eq. Pl., §§ 403, 412. This in causes in chancery, when the decree had been enrolled. For the law applicable to bills for new trials, see *Doubleday* v. *Makepeace*, 4 Blackf. 9.

We frankly concede that under these statutes Mrs. *McQuigg*, as the divorced wife of the appellant, could not open the judgment which the *Marion* Circuit Court had rendered against her. With or without actual notice, it was conclusive, and silenced her, whatever her wrongs may have been. So, too, she could not ask a review of the proceeding. If there were errors of law, she had her appeal, and nothing more. If there was newly discovered evidence, no matter how overwhelming it might have been, the law forbade its production. But we argue that her application does not fall within the terms or spirit of either of these inhibitory clauses. She does not seek for a new trial. She does not ask a reversal or modification of the judgment of divorce. She does not, in either of these forms, so far intimate a sentiment of respect for the proceeding, as to give in her adhesion to its validity. She avers that it is an absolute nullity, a creature of falsehood and fraud, having only a colorable existence; and this sham she seeks to expose and explode. Surely there can be no great difficulty in perceiving the distinction that exists between a proceeding which recognizes the validity of a judgment, and seeks to open it for the opportunity of defending the suit, or to review it for the purpose of a new trial, or in hope of reversal for error in law; and a proceeding, denying the validity of a pretended judgment, and seeking to have the record on which it appears, cleared of such rubbish. Here the evidence of fraud is invoked—of fraud as a "collateral, extrinsic act which vitiates the most solemn proceedings of Courts of justice." *Conway* v. *Beazley*, 3 Hagg. 639.—*Borden* v. *Fitch*, 15 Johns. 121, 145.

The legislature may have satisfied themselves that there were peculiar conditions affecting divorced parties, which deserved, to a certain extent, the prudent consideration of the lawgiver. New ties are soon formed, and innocent parties, it may be, involved. It may be very well, in view of these things, that judgments of divorce shall not be opened or reviewed. If the petitioner has acted in good faith, let him go with his divorce. But it would be monstrous to whitewash fraud, to open the Courts to the tricks of dishonest men, and to suffer the officers of the law to be imposed upon and converted into artificers of injustice. In such cases, the legislature took no notice of consequences. It left the party who swindles a Court into a fraudulent judgment of divorce, precisely where he would have been, if acting more boldly, though not more wickedly, he had incurred the penalties of bigamy.

The foregoing discussion removes, we think, the statutory objections, and settles the question that there is not any act of the legislature which places a judgment of divorce, so far as it may be affected by fraud, upon any different ground from other judgments. Is there any difference of principle recognized by the law which secures to this class of judgments an immunity from the consequences of fraud? We think not; and proceed to a brief examination of authorities to support our view. "If a tribunal has been imposed upon, and in consequence of the fraud a judgment of divorce has been wrongfully rendered, it may vacate this judgment, when, upon a summary proceeding, it is made cognizant of the fraud. So the *Pennsylvania* Court, in a recent case, decided upon the strength of the *English* authorities; and further, the order vacating the decree of divorce, was, after the time for appeal had elapsed, conclusive; although a second marriage had been in good faith contracted, and although the vacating order was passed without actual notice to the party in the divorce suit against whom it operated. The authority principally relied upon to sustain this decision was the case of *Prudham* v. *Phillips.* 'The principle,' observed GIBSON, C. J., 'is a general one, and applicable alike to ecclesiastical sentences and common-law judgments. It has no relation to the doctrine of amendments, which make the record speak a language it did not speak before; the vacation is a new and independent judgment, of which the recorded entry is its appropriate evidence. It may be an arbitrary act to expunge a sentence of divorce with a stroke of the pen, bastardize after-begotten children, involve an innocent third person in legal guilt, and destroy rights acquired in reliance on a judicial act, which was operative at the time; and under this first impression I would have decided as did the judge at *nisi prius.* But the legitimate husband has his rights; and if any one must suffer from the invalid marriage, it is he who procured it. By the terms of the contract, he took the lady for better or worse; and having assumed at least her moral responsibilities, he stands as to hardships in her place. He, therefore, has no right to complain." Bish. on Mar. and Div., §§ 699, 700, 706, 707.

*Mansfield* v. *Mansfield,* 26 Mo. R. 163, is a case in point. "The only ground upon which a judgment in this case is sought to be reversed, is the 14th section of the act concerning divorce and alimony, in the Revised Code of 1855. That section provides that no petition for review shall be allowed, of any judgment for divorce rendered in any case arising under this act, any law or statute to the contrary notwithstanding; but there may be a review of any order or judgment touching the alimony and maintainance of the wife, and the care, custody, and maintainance of the children, or any of them, as in

other cases. This statute did not go into effect until *May*, 1856. This suit for divorce was commenced in *April*, 1855. The provision is only applicable to proceedings commenced under the act, and consequently has no application to this case. To what extent the legislature designed to close the doors of Courts of justice to parties to divorce suits by this enactment—whether the grossest frauds perpetrated in *ex parte* proceedings must be understood as perpetrated upon the record, without any power in Courts to give redress—is a question which may hereafter become important. This Court has no power or wish to anticipate a decision on this question, nor have I individually any desire to put forward any suggestions of my own. It occurred to me, however, that the facts in this case named furnish a strong commentary upon a very rigid and literal construction of the 14th section above referred to. I state them merely as they stand admitted on the record by demurrer. The plaintiff persuaded his wife to pay a visit to her mother, in *Illinois*, representing to her that her health, which was delicate, would be very much improved by such a trip. No sooner had she started than he institutes a suit for divorce, upon the indefinite charge of personal indignities, consisting of abusive and threatening language. Representing her to be a non-resident, he procures an order for publication, and at the first term of the Court, upon proof, as the record states, that he was an injured party, he gets a divorce. In the meantime, he had kept up an affectionate correspondence with his wife, couched in the most loving terms, and had also invited her and persuaded her to remain in *Illinois*, upon assurances that he designed moving there, and that her return to *Missouri* would be an unnecessary and expensive journey. The wife finally returns to this state, and for the first time learns that she is no longer a wife; that she and her children are thrown upon the world without any allowance, and with charges against her reputation and character, of which she never heard before. She comes into Court within the period allowed by law, as it stood before 1856, and as it still remains in all other cases, and asks to be heard in her defense, declaring the utter futility of the charges, and stating her ignorance of the whole proceeding from first to last. To this petition the plaintiff demurred, and the Court overruled the demurrer. The plaintiff then took a non-suit. Of course, one could have but one opinion of the merits of this case. Did the statute of 1855 intend that *ex parte* decrees in divorce cases, obtained by fraud, should never be disturbed or looked into? If the provisions were limited to cases where a second marriage intervenes, a motive for such an enactment could be perceived; but when no new ties have been formed, why put judgments in these cases on any other footing than all other judgments, where they have been brought about by fraud?"

In this case, it will be observed that the Court saved it from the operation of a statute like ours, forbidding the review of judgments of divorce. It will appear, also, that it was an original petition, attacking the judgment and tendering proof. It is further obvious that the Court had jurisdiction of the subject-matter—the *status* of the parties—as there could have been no question of domicil. In this particular it is a much weaker case than the one before the Court, where, by a fraud upon the law, jurisdiction has been unconsciously usurped by the Court. And in this case, the judge, dwelling at length upon the circumstances of fraud, and doubting even the application of the statute denying a review, is so much preoccupied with the point, that the case is saved by reason of the date at which the restrictive clause was adopted, that he does

not see the natural distinction between reviewing a judgment for error in law, or newly discovered evidence, and impeaching it directly for fraud. It is fair to assume, if his way had not been opened by this question of dates, he would have soon disembarrassed himself by cutting through the bark of his case.

*Smith* v. *Smith*, 4 Iowa R. 266, illustrates the view we take of this case:

"On the 19th day of *January*, 1854, a writ of error *coram nobis* was issued, on the application of *Rosetta Smith*, returnable to the *March* term of the District Court of *Dubuque* county, in the case, when the parties appeared for hearing thereon, with testimony to establish the grounds of merit. The respondent, *Rosetta L. Smith*, by her counsel, moved the Court to set aside the decree of divorce granted at the last term of the Court, on the complaint of her husband, *Asabel L. Smith*, against her, for reasons in her application on file; and further protested against said proceeding :

"1. Want of jurisdiction in the Court.

"2. The want of sufficient notice that should be legally binding on her. And she protested against the proceeding generally.

"After argument had, the Court decided that it did not possess jurisdiction of the case; but also set aside the decree of divorce, entered at the previous term, and allowed the defendant to come in and file her answer, and make defense to the petition. * * * *

"The third assignment of error is also well taken. Section 1480 of the code, makes the residence of the plaintiff within the county, an indispensable requisite to give the District Court jurisdiction, in all cases of divorce and alimony. Such residence must be *bona fide*.

"A mere temporary sojourn for a season, *in transitu*, without intent of domiciliation and citizenship, is not what we understand by the residence contemplated by the legislature. It certainly could not have been intended by the legislature that a malcontent of marriage contract, wishing to be free from its sacred obligations, should be permitted, in a clandestine manner, to leave his family and home in another state, where the law would have enabled him to adjust his rights, and redress his grievances, if any existed; where the parties to such proceeding both resided and could be fairly and fully heard; where the acts of the complaint, if any, all transpired, and the testimony could be most conveniently procured; and come to this state for the sole and specific purpose of remaining here six months to set up a residence, that he might procure a divorce and then return.

"Such preliminary changes of venue, at the option of a party to the marriage contract, we opine, cannot be sustained by either the letter or spirit of our code. To give such effect to it, would be judicial condemnation of the wisdom and morality of legislation. The evidence of the case establishes the fact, by the statement of the plaintiff, that he had been advised by an attorney that he could procure a divorce more easily in *Iowa* than in any other state, and that he had been staying in *Dubuque* long enough for that purpose, and no other; that he was on his return to the state of *New York*, and would never live with his wife again. In the case of *Hunt* v. *Hunt*, decided at this term, we have expressed our unwillingness to add to statutory facility, that of loose judicial construction, to aid in the procurement of divorces from the marriage contract. Upon the most deliberate consideration of the subject, we reiterate what we expressed in that case. The family relation lies at the foundation of society. Upon it rests the well being and hopes of the community. In its

rights, duties, and responsibilities, are involved the dearest interests of the state. The law, by enactment and due administration, should cherish and guard it with sacred fidelity. Otherwise, instead of being the legitimate means of individual and general happiness and prosperity, it will be perverted, and become the fruitful source of misery and ruin. It is the duty of our judicial tribunals to expound faithfully the enactments of the legislature, and give them due effect by legal execution. This we will do; but in the absence of legislative provisions requiring it of us, we are not ambitious to establish for *Iowa*, by judicial construction, the humbling distinction of being the state in which a divorce can be most easily obtained! The effect would be to make our young state the receptacle of those who are regardless of domestic and social virtue, and her laws the instrument of wrong, by depriving the innocent and unsuspecting of their rights.

"We are of the opinion that the plaintiff had not acquired such a residence as is required by the code; that, therefore, the District Court could not exercise jurisdiction in the case, and the complaint must be dismissed. Decree reversed."

The case of *Allen* v. *McClellan*, 12 Penn. R. 328, is a leading case, the opinion having been given by the late Chief Justice GIBSON. This case has been improperly remarked upon as a case not between the divorced parties, but a case between the one who procured the fraudulent divorce and a stranger. This is true, to some extent, for it was an action upon a note, indorsed by the second husband of the divorced woman to a third person. This, however, does not, in the slightest degree, affect the case as one in point; for the proceeding to set aside the divorce was at the instance of the injured husband, and was the gravamen of the case cited, and, indeed, is passed upon and decided by the Supreme Court precisely as if an appeal had been taken from the vacating order. The facts are, that "in 1845, a libel for a divorce was filed by *Lucretia Bleeker*, in the Court of Common Pleas of *Philadelphia*, alleging desertion and cruel treatment. The record showed that a copy of the interrogatories to be propounded to witnesses, and the notice of taking the testimony, was posted in the prothonotary's office ten days before the examination of the witnesses. The evidence was taken and returned, and a decree of divorce entered *November* 22, 1845. A certified copy of this decree was exhibited to *Wheatley*," the man with whom the second marriage was contracted, "by the father of the libellant, upon the faith of which, *Wheatley* married. her, on the 12th of *January*, 1846. On the 13th of *February*, 1846, *Bleeker* applied to the Court to revoke and rescind the decree of divorce."

The application denied the truth of the libel, and charged the libellant with adultery. Notice was left at the reputed residence of the libellant, but it was shown to the Court that she was absent from the state. On the 7th of *March* this decree was entered:

"Ordered that the proceedings and decree in this case be annulled, on the ground that the same was obtained by fraud and imposition on the Court."

The record did not show any appearance of the libellant, nor the production of any evidence. It appeared that Mrs. *Wheatley* had no issue by *Bleeker*, but that by her second husband she had issue, a child born *November* 4, 1846.

This is direct enough. It was a summary proceeding by the husband to vacate the divorce, on the ground of falsehood and adultery. In this particular, it is by no means so strong a case as the one we are discussing. The

Court says it was imposed upon. How? By means of a false libel, preferred against an innocent man, by a woman who was herself an adulteress. This is giving the case its utmost color, supposing the proofs were equivalent to the allegations. It is not insisted that there was a want of jurisdiction, and that the Court was imposed upon to the degree of assuming powers beyond the law. The opinion of GIBSON, C. J., goes directly to the point that a Court, when imposed upon, and induced to render a judgment through fraud, may, in a summary proceeding, at a subsequent term, vacate the judgment so obtained. The importance and interest of the case induce us to present it in full in a note at the end of this brief. See note A.

We have so far considered this case upon principle and authority, chiefly from the stand-point of fraud. We complain of it because the proceeding is tainted with this poisonous ingredient; because through the forms of law a false judgment has been recorded; not merely because of an injury to private rights, but because the Courts by such acts are prostituted to wicked uses, and public justice degraded by the imposition which foists an illegal jurisdiction upon them. But there is another ground of which we must not lose sight; and that is this want of jurisdiction, which makes the case, from the beginning to the end, *coram non judice.* It is under certain conditions that the legislature gives the Circuit Courts the power to entertain jurisdiction of the subject-matter. That subject-matter is the *status*, the relation, of the parties. We do not pretend to question the power of our Courts to grant divorces for causes arising beyond our territorial limits; but we do insist that when any power of control over a relation so important to the safety and good morals of society as marriage is assumed, the statutory conditions upon which alone that power arises shall be respected. A "petition" may be "filed by any person at the time a *bona fide* resident of the county." Upon such petitions "divorces may be decreed by the Circuit Courts of this state." Now, this provision is not for the purpose of giving a personal jurisdiction; it is for the purpose, when the petitioner is a resident in good faith, of conferring a right upon him, and giving the Court jurisdiction over the subject-matter of the controversy, the marriage relation, without any regard to the domicil of the other party. If, then, the petitioner be not a resident of the county when he presents his petition, the Court has no jurisdiction whatever to entertain it, and every step taken in the cause, whether with or without the appearance, or with or without the consent of the adverse party, is void.

It is sufficient here to refer generally to the various decisions upon this subject in our own Supreme Court.

"The judgment of a Court in a suit requiring ordinary adversary proceedings, which appears on its face, or may be shown by evidence (in a case where, by the rules of evidence, it may be shown,) to have been rendered without jurisdiction having been acquired by notice, of the person of the defendant, or without jurisdiction of the subject-matter, is void, and may be so treated when it comes in question collaterally." Perk. Dig. 539, and cases there cited.

*Freeman* v. *Freeman*, 1 Mich. R. 480, is an appeal from chancery: "A petition for divorce was filed against a non-resident defendant, under R. S. 1838, and the following order made for the appearance of the defendant: 'It satisfactorily appearing that the defendant, *Rebecca Freeman*, is not a resident of this state, but that she resides in the city of *New York*, on motion of the plaintiff, it is ordered that said defendant cause her appearance in this cause to be

entered within four months from the date of this order, and that, in case of her appearance, she cause her answer to said petition to be filed, and a copy thereof served on the petitioner's solicitors, within forty days after service of a copy of said petition, and a notice of this rule, and in default thereof the petition will be taken as confessed. And it is further ordered, that within twenty days the petitioner cause a copy of this order to be published in the state paper, and that said publication be continued in said paper at least once a week, for eight weeks in succession, or that he cause a copy of this order to be served personally on the defendant, at least twenty days before the time provided for her appearance.'

"The order was published. The defendant did not appear. Testimony was heard and a divorce decreed. The Court held that under the statute the order should have included a notice of the nature of the petition. That as it did not, in that respect, comply with the statute, the decree was wholly void for want of jurisdiction in the Court."

This divorce was a nullity, not for any fraud; not for any imposition on the part of the plaintiff upon the officers of justice; not for the want of jurisdiction over the subject-matter; but because jurisdiction over the person of the defendant could only be acquired by apprising her of the nature of the petition, and this prerequisite had been omitted. How much more clear is it that such a judgment is a nullity, when the Court rendering it has no jurisdiction over the subject-matter.

In *Thompson* v. *The State*, 28 Ala. R. 12, the Court, after noticing cases referred to in argument, proceed—"All of the above citations, except one, are of *New York* and *Massachusetts* decisions. In none of the *New York* or *Massachusetts* cases was the decree for divorce in another state held void upon the exclusive ground of a want of notice and jurisdiction of the person of the defendant. In all of them there was fraud in the procurement of the divorce, and absence of a *bona fide* residence in the state where the divorce was granted, and most of the decisions are based on these grounds alone. We do not controvert the authority of those decisions, so far as they assert that fraud in the procurement of a divorce, or want of *bona fide* residence of the person obtaining it in the state where it was granted, would render the decree null and void. Thus far they are sustained by reason and the other authorities. * * * * If the defendant did not go to *Arkansas animo manendi*, or if he went to that state merely for the purpose of obtaining a divorce, and intending to remain no longer than was necessary to accomplish his purpose, or if the divorce was procured by fraud, the decree of the *Arkansas* Court would be void, and the appellant, in marrying again in this state, while his former wife was living, would commit the crime of polygamy." See, also, *Hinds* v. *Hinds*, 1 Clarke (Iowa R.), 36; *Shonwald* v. *Shonwald*, 2 Jones Eq. (N. C.) 366.

"When parties resort to the Courts of a foreign state or country, without a change of domicil, for the purpose of obtaining a divorce to which they would not be entitled by the law of their own country, the divorce, as we shall hereafter see, will be treated at home as invalid. The true principle is, undoubtedly, that the foreign tribunal had no proper jurisdiction over the subject-matter, being one of *status*, with which the Courts of the parties' domicil are alone competent to deal. Yet this case is sometimes treated as one of fraud." Bish. on Mar. and Div., § 709.—*Jackson* v. *Jackson*, 1 Johns. 424.

And the general doctrine is laid down by the same writer, at § 721: "The

Nov. Term, 1859.

McQUIGG
v.
McQUIGG.

tribunals of a country have no jurisdiction over a cause of divorce, wherever the offense may have occurred, if neither of the parties has an actual, *bona fide* domicil within its territory."

The authorities supporting this principle are clear and abundant. The point has been repeatedly decided in *New York*. *Bradshaw* v. *Heath*, 13 Wend. 407.* The same is true of *Massachusetts*. *Barber* v. *Root*, 10 Mass. R. 260. In the latter case, the judge uses this language: "The laws of *Vermont*, which authorize the Supreme Court of that state to proceed in suits for divorce instituted in favor of persons resident for a time, but having no settled domicil within the state, against persons resident and domiciled in other states; * * * in short, where no jurisdiction of the subject-matter can be suggested or supposed—are not to be justified by any principles of comity which have been known to prevail in the intercourse of civilized states. I must be permitted to say the operation of this assumed and extraordinary jurisdiction is an annoyance to the neighboring states, injurious to the morals and habits of the people, and the exercise of it is, for these reasons, to be reprobated in the strongest terms, and to be counteracted by legislative provisions of the offended states."

We respectfully submit that upon statutory grounds, and upon a series of decisions remarkable for uniformity, it is unquestionable law, that without the petitioner has a domicil established in good faith in this state, the marriage relation which he seeks to have dissolved, is a thing not subject to the laws of *Indiana*, and beyond the jurisdiction of the Court; and that a decree of divorce pronounced under such circumstances, is void. And that, when a fraud is committed by a pretended residence, it is not merely a fraud *inter partes*, but it is a fraud upon the law, an imposition upon the ministers of the law, and such a perversion of justice, as gives the cause somewhat of a public character, when an effort is made to overthrow the fraudulent judgment.

Touching the residence, the character of the evidence will appear from the following abstract:

*Alvah B. Archibald*, brother-in-law.—Defendant went to *Indiana* in the fall of 1853. Witness had charge of house and business. Defendant returned *March* following. Thinks he made visit back during the interval. Left his household furniture behind. Witness surrendered the business on his return. Mrs. *Archibald* went there *April*, 1852. Witness, fall following. Remained till 1854—had no charge of business until fall of 1853. Defendant said he had examined the laws of several states—divorces were easier in *Indiana* than in any other. Said he was going to *Indiana*. On his return, in the spring, went to *Kansas*, and in 1855 to *Flint*. Kept house a year at *Elmira*, after his return from *Indiana*. In his letters, spoke of when he expected to be at home. Gave directions about business, and wrote for money. Just before going to *Indiana*, ceased to talk of various places in the west as good business points. Said *New York* was the worst place in which to obtain a divorce—*Indiana* was the easiest—six months' residence, and proof of his wife's absence was enough.

*This doctrine is asserted in a late case, by DAVIES, J., in the Supreme Court of *New York*. We cite it, not to indorse it throughout, but as sustaining the principle contended for. See at the end of this brief, Note B., from report in the *Daily Times* newspaper.

*Mary Talcott,* defendant's cousin.—Said he was going to *Indiana* to get a divorce. One year's residence necessary. Must have a divorce. Could not get one in *New York*—could not find a cause of divorce in *New York.* Substance of frequent conversations, that he was going to *Indiana* to get a divorce. Spoke of nothing else as his object. This was between his first and second trip west.

*Charlotte Brown.*—Said he was going to *Indiana* to get a divorce. Could get one easier and cheaper there. Resumed his business when he came back. The laws, he said, were best in *Indiana.* Am sure he told me he went west to see what the laws were. When he returned, said he had sold out. That *Indianapolis* was on old *Dutch* place—too many old *Dutch* fogies there.

*Margaret Falkner.*—Said he was going west to get a divorce. Took charge of his business on his return.

*N. W. Davis.*—Said he was getting a divorce in *Indiana.*

*Jesse McQuigg.*—Is brother of the defendant. Said he was going to *Indiana* to get a divorce. Because he could not get one in *New York.* This was after he had been to *Indiana.* Left his children in *New York.* In *New York,* separation was not sufficient. Said he had got a divorce. Talked this to any one. Came back in the spring, and then went away to get married. Did not then get married, as there was some fear about the divorce. Said he must go into business in *Indiana,* to enable him to get a divorce.

*Mary E. McQuigg,* daughter of defendant.—The defendant resided in *Barton, Tioga* county, *New York*—had resided there ever since witness can remember. He went from home west, in the spring of 1853—was absent some eight or ten days. Said he went to *Indianapolis.* After his return, he remained in *Tioga* county until *November,* 1853. Carried on his usual business on the farm, during 1853, till *November.* He then said he was going to *Indianapolis,* and stated he would be gone nearly all winter. He returned to *Tioga* county in *March,* 1854. During the winter, he wrote several letters, saying he would be home in *April*—but he came back in *March.* After his return, in *March,* he remained until *September,* 1854. He then removed his furniture and family to *Elmira, Chemung* county, *New York,* and said that place would probably be our home. We were there about one year, when he went away, leaving myself and sister at school. He took no visible property, nor any member of his family. Said he would be gone but a little while—he had some little business there. This was when he went to *Indianapolis.* Defendant carried on farming in *New York*—the lumber business in *Michigan.* Never heard of him being in the candle making business in either of those states. I have heard him say that he did not like *Indianapolis*—that it was not a very pleasant place.

*Dewitt D. Duryea.*—Knows defendant started for *Indiana* in *July,* 1853, and returned in *September.* Told witness, before he started, that he was going west to obtain a divorce. After coming back, in *September,* he remained in *Barton* until *November,* and then returned to *Indiana,* and remained there until about the 15th or 20th of *March,* 1854. On his return, myself and brother purchased his farm. He remained in *Barton* until about the 10th of *April,* and then was back and forth from *Barton* to *Owego,* until some time in *May* or *June,* when he started for *Nebraska.* On his return from *Nebraska,* he removed his furniture to *Elmira,* and lived there until some time in the spring of 1855, when he removed to *Michigan.* When he returned from *Indiana,* in the spring of 1854, he told me he had not got through with the business between himself

and his wife. I received a letter from him, in 1854, in *February*. When he left, he placed his farm and business in the hands of *Alvah Archibald*, and took it into his own hands. His household furniture remained in the house, on the farm, until *August*, 1854. On his return, in *March*, 1854, I asked him how he liked the country, and he said, not well enough to go there to farm it.

*William Bensley.*—Defendant resided in the town of *Barton, Tioga* county, up to 1854, and moved to *Elmira*, in 1854; resided there about one year. Then moved to the state of *Michigan*. In 1853, in *November*, he went west. He told witness, about the time he left here, in 1853, that he was going to *Indiana* to get a divorce. He had previously told me that he thought of going to *Pennsylvania*, but he would have to stay there too long to gain a residence; it would take a year to gain a residence. He returned from *Indiana* in *March*, 1854. Soon after he returned, he told me he had got a divorce. Resumed his business here. Remained here, at *Barton*, and in this vicinity, till the fall of 1854, then moved to *Elmira*. In *May* or *June* of 1854, he was absent about three weeks, and told me he had been to *Nebraska*, with Judge *Avery*.

*Owen Cullins.*—Defendant said he came west to see what prospect there was for business in the west. If he could suit himself in the west, he would sell out in the east and come west. Talked of the lumber business. Said he had a farm in the east, and his family was there. Put up a candle factory.

*Judge Avery, for defense.*—We started from *New York* together, say in *April* or *May*, 1854. We came by *Indianapolis*, and he was to go to *Nebraska* with me. I loaned him money to bear his expenses. Can't tell how long we remained in *Indianapolis*—several days. Didn't come here to have *McQuigg* get his divorce. The case was tried here. I was in Court when it was tried. *McQuigg* put up at a hotel, and stayed there till we went to *Nebraska*. In the fall of 1854, he was in *Michigan*, and in 1855, removed to and became a permanent resident there.

*Mr. Gulick.*—Don't know when *McQuigg* left *Indianapolis*, in 1854. We had some negotiations for sale of the factory to me, in summer of 1854, about the time he started to *Kansas* or *Nebraska*.

We have presented this summary to show the ground upon which the jury proceeded, in finding that the appellant had never any residence in this state. We shall go into no discussion upon the evidence. We ask for it merely an examination, particularly of that of Mr. and Mrs. *Waldo*, witnesses for the defense. We are very sure there can be no doubt that *McQuigg* had, at no time, a residence in this state.

We propose to notice, as far as may be necessary, the other points presented in the record. The errors assigned, are the following: 1st, overruling the demurrer to the complaint; 2d, overruling the motion for a new trial; 3d, overruling the motion in arrest of judgment; 4th, overruling the motion for judgment in favor of the defendant *non obstante veredicto*; 5th, rendering the judgment which was rendered. So far as these points are concerned, we have nothing further to urge.

There are various exceptions taken, in the course of the proceeding, by the defendant's counsel, which are not assigned for error. We, therefore, ask the special attention of the Court to the assignment of errors. Those not already enumerated, are: 6th, overruling motion for a bond for costs; 7th, overruling motion to suppress the depositions of *Mary E. McQuigg, Charlotte Brown, Warren Bensley, M. H. Hollensbeck, Margaret Falkner, N. W. Davis,* and

*Eliza W. Farnham;* 8th, the refusal to give the charge asked by the defendant; 9th, the giving of the 4th, 8th, and 9th charges given by the Court. Of these, briefly, in their order.

As to the bond for costs: We insist that the Court decided properly that, in this case, no bond for costs should be required. The divorce proceeding admits that the plaintiff had been the wife of the defendant. She comes forward in this suit, and proposes to prove that the judgment of divorce was procured by fraud; that the Court was imposed upon by a false pretense of residence, and that no jurisdiction over the cause ever existed. Upon the double view that it was a divorced wife seeking to annul the judgment of divorce, and that it was, in some degree, a public proceeding to vindicate the purity of the Court, it was ruled that no bond could be required. Further, there was prayed a change of venue, by the defendant, which was granted, and a judgment for the costs against him up to that time. It afterwards appears in the record, that the cause had been followed to *Johnson* county, where it was agreed in writing that it should be ordered back to the *Marion* Circuit Court, to be reinstated on the docket. The motion for costs was not afterwards renewed. And finally, "the merits of the cause have been fairly tried and determined in the Court below." 2 R. S. p. 163.—*Rockhill* v. *Spraggs,* 9 Ind. R. 30. Under our code, the ruling in *Griggs* v. *Voorhies,* 7 Blackf. 561, could not have been made. The spirit of the decision in *Culley* v. *Laybrook,* 8 Ind. R. 285, is in harmony with this view.

As to the depositions: The assingment of errors complains of the refusal to suppress one entire deposition, that of *Mary E. McQuigg.* This witness was examined under an order of the Circuit Court. 2 R. S. p. 86, § 249. There was no motion made for a continuance, on the ground that the deposition was not filed in time. 2 R. S. p. 88, § 263. The deposition was taken in *December,* 1857; the cause was tried in *January,* 1859. These observations are sufficient to satisfy the Court that the motion to suppress was properly overruled. The assignment further complains of the refusal to suppress the depositions of *Charlotte Brown, Warren Bensley, Matthias H. Hollensbeck,* and *Nathaniel W. Davis.* It is difficult to understand precisely what depositions are meant by the counsel. There are on file two depositions of *Davis.* There are also two *Bensleys* whose depositions were read to the jury, *John* and *William;* but there does not appear on the record the deposition of any one named *Warren Bensley.* We infer from the written motion made by the defendant, asking the suppression of depositions, that the design is to assign for error parts of the deposition taken by the plaintiff before *John Ripley,* Esq., at *Owego, New York.* The motion is made to suppress "all of *Warner's* deposition, marked B." This is, perhaps, meant to apply to the deposition of *Samuel Warren.* "All of *John Bensley's,* marked C. All of *Matthias Hollensbeck's* deposition, marked D. All of *Margaret Falkner's* deposition, marked E. All of *Nathaniel W. Davis'* deposition, marked F." And the reasons assigned in the motion are, that the depositions are irrelevant to the issue; that the certificate is irregular; and that the commission had expired, from the 7th to the 12th of *October.*

Referring to the deposition, it will appear that the commission is directed to *John Ripley,* Esq., who is authorized, at his office, in *Owego, Tioga* county, *New York,* on the 6th day of *October,* 1857, to take depositions on behalf of the plaintiff. The defendant attended every day, and cross-examined; and on the last day, proposed to introduce witnesses on his own behalf. The certifi-

cate was drawn with great care, and is, in every respect, in conformity with the statute. It has no official seal, but there is nowhere an objection on this ground.

It is alleged in the bill of exceptions, but not in the motion to suppress, that "It does not appear by the depositions, or certificate, that they were taken before any person or officer authorized by law to take and certify depositions." Now this, although somewhat broader language than is used in the motion to suppress, is not an objection for the want of authentication of the official character of the officer. Such authentication is not to be found in the deposition or certificate. How is the Court to say that it does not appear that *Ripley* was not a person authorized to take depositions. Because he is not described as an officer? No official character is required, other than that which arises from his special employment as a commissioner. The common law power of the Courts to appoint commissioners to take depositions, is continued by the statute. 2 R. S. p. 84, § 245.—*Id.* 87, § 260. And it is clear the statute does not mean the class of officers appointed by the governor to take depositions in other states. They are officers, and need no special appointment by the Court, in any case. The statute, moreover, at § 260, last cited, distinguishes between officers and commissioners. The latter are mere creatures of the Court, appointed *pro re nata*. It may be urged that, in this instance, there does not appear, pursuant to § 245, that an appointment was made by the Court. But how does the Supreme Court know that fact? For all that appears, such an appointment may, or may not, have been made. It is very certain that no objection has been made to the deposition, for the want of such an appointment.

The record discloses the fact that a commission was issued by the clerk, directed to Mr. *Ripley*. Section 60 declares that no order of Court shall be necessary. If none is required, the deposition is good. If one is required, no exception for the want of an order of Court, has been taken. So far as the objection goes to the want of relevancy, the defendant has had the full benefit of it; the Court below instructed the jury that there was no point to be considered but the question of the defendant's residence. *Lewis* v. *Lewis,* 9 Ind. R. 105.

If it can be possible that the motion to suppress was improperly overruled, the objection only goes to that part of the testimony which touched the question of residence. We have sufficiently vindicated the deposition of *Mary E. McQuigg.* That of Mrs. *Farnham* contains nothing upon the subject of residence. There remain, then, the depositions of *Brown, Warren, Bensley, Hollensbeck, Falkner* and *Davis.* Leaving their evidence entirely out of the case, it will be found that abundance of testimony remains to support the verdict. If so, no reversal can be had. *Parker* v. *The State,* 8 Blackf. 293.—*Billingsley* v. *The State Bank,* 3 Ind. R. 375.

The depositions last named, are but parts of the whole, taken at *Owego,* before Mr. *Ripley.* We suggest that the motion to suppress a part, cannot go to a question affecting the admissibility of the entire deposition. The defendant, confining his attack to the deposition of the witnesses named, admits the regularity of the deposition, so far as the other witnesses named in it are concerned. The regularity of the deposition to this extent is, therefore, conceded; and the instrument if regular for one purpose, is regular for all purposes.

As to the charges given and refused, we shall make no comment upon them.

The instructions of Judge MAJOR were full and clear upon the only point submitted to the jury; the only point to which the jury responded.

We have thus discussed the real and vital question in this controversy, as fully and forcibly as it is in our power to do. The minor questions all yield to the consideration, that it appears from the record the cause has been fully tried and determined upon its merits. We are well aware that there are embarrassing considerations affecting one of the parties, upon which a strong appeal may be made to the Court. We might urge, on the other hand, the cruel injury which the defendant has inflicted on the plaintiff. He has left her to poverty. He has deprived her of her children. He has, by placing her in the position of a woman divorced at the suit of her husband, sought to impair her good name. But we care nothing for the influence of such considerations, as we know the case ought to be decided upon principle. We believe it will be so decided. And the settlement of the case in accordance with principle, will certainly convey a salutary lesson to that large class of discontented or lecherous pilgrims seeking the *Mecca* of divorce, who turn their faces towards *Indiana*, as the happy region where the judgment they wish can be obtained the most easily and the most cheaply. It will secure private rights, by vindicating the purity of public justice.

Counsel added the following notes to their argument:

NOTE A.—*Allen* v. *McClellan*, 2 Jones, 12 Penn. St. R. 328.

1. The Court of Common Pleas have the power to vacate a decree of divorce, entered at a previous term, where it was obtained by fraud on the Court, although a marriage had been contracted subsequently, on the faith of such decree, with a party thereto, and issue born.

2. A decree reciting that the former decree was vacated for such causes, is conclusive, after the time for an appeal has elapsed, though there is nothing on the record to show that proof of the fraud was made; and, although it was admitted that, when service of notice of the intended application to vacate was made, at the reputed residence of the libellant, she was out of the state.

Assumpsit on a promissory note, drawn by the defendant at four months, in favor of *Lucretia Bleeker*, dated *December* 5th, 1845. On the 16th day of *January*, 1846, *Wheatley*, for himself, and *Lucretia*, his wife, (late *Bleeker*) indorsed the note to the plaintiff. A case was stated in the nature of a special verdict, and the facts were these:

The payee of the note was married to *Bleeker*, in 1840. In 1845, a libel for a divorce was filed by her in the Court of Common Pleas of *Philadelphia*, alleging desertion and cruel treatment, The record showed that a copy of the interrogatories to be propounded to witnesses, and the notice of taking the testimony, was posted in the prothonotary's office ten days before the examination of witnesses. The evidence was taken and returned, and a decree of divorce entered *November* 22, 1845. A certified copy of this decree was exhibited to *Wheatley*, by the father of the libellant, upon the faith of which *Wheatley* married her, on the 12th of *January*, 1846. On the 13th of *February*, 1846, *Bleeker* applied to the Court to revoke and rescind the decree of divorce.

The application contained simply a denial of the allegations of the libel, and averred that the libellant had previously been guilty of adultery.

A notice of the application to vacate the decree, was served at the reputed

residence of the libellant. But the fact that she was at the time absent from the state, was communicated to the Court on the 7th of *March*, 1846, when the following decree was entered by the Court:

"Ordered, that the proceedings and decree in this case be annulled, on the ground that the same was obtained by fraud and imposition on the Court. There was nothing on the record showing that any proof was taken preparatory to this order, or that the libellant appeared. The verdict further found that the libellant had no issue by her husband, *Bleeker*, but that by her second husband, *Wheatley*, she has issue—a child born *November* 4, 1846.

Whether the plaintiff could recover on the note, was the question submitted.

The Court gave judgment for the plaintiff.

*Jan.* 8, 1850, GIBSON, C. J.—The case which most distinctly recognizes the power of a spiritual Court to vacate its sentence, when obtained by imposition, is *Prudham* v. *Phillips*, stated in *Meadows* v. *The Dutchess of Kingston*, Amb. 763, and rather more fully in Harg. Tracts, 456, note. It was tried before Chief Justice WILLES, in 1737; and, though a *Nisi Prius* decision, it was quoted with approbation by Lord APSLEY. To show, by analogy, that the sentence in a suit of jactitation of marriage is conclusive in a common-law action, the chief justice took a distinction founded on the common-law principle, that a party to a fraudulent judgment can reverse it only directly, but that a stranger may reverse it collaterally, by pleading and evidence. "Who ever knew," he said, "a defendant plead that a judgment against him was fraudulent? He must apply to the Court; and if both parties colluded, it was never knows that either of them could vacate the judgment. Here the defendant was a party to the sentence, and whether she was imposed upon, or whether she joined in deceiving the Court, this is not the time and place for her to redress herself. She may, if she has occasion, appeal, or apply to the proper judges."

So was it with the legitimate husband in the case under consideration. The time for appeal had gone by, and he applied to the only tribunal that was open to him. Chief Justice WILLES does not intimate how it ought to proceed on the application; but it must necessarily be by summary examination and order. In Bacon's Abr. Error, 1, 6, the remedy for a surreptitious judgment at common law, is said to be a writ of error *coram nobis;* but *Ronney* v. *Robinson*, 2 Roll. Abr. 724, which is cited for it, leans the other way. If a clerk of the King's Bench, it was there said, enter judgment against an order by a judge of the Court, it may be vacated at a subsequent term. If by a writ of error, it would have been unnecessary to say anything about the time; and the meaning undoubtedly is, that such judgment may be vacated after the term, just as if the records were still in the breast of the Court. That case shows that the principle of *Prudham* v. *Phillips,* is a general one, and applicable alike to ecclesiastical sentences and common-law judgments. It has no relation to the doctrine of amendments, which make the records speak a language it did not speak before; the vacation is a new and independent judgment, of which the recorded entry is its appropriate evidence. If it can be entered only on a writ of error, what is to be done with a surreptitious sentence of an ecclesiastical Court, to which no such writ lies? As imposition on it would else be without means of correction, it must necessarily have a power of summary revision. Facts put in issue, as they may be, by pleading in error, are triable by jury; but as there is no jury in such a Court, there is the less objection to

summary proceeding by it. There is certainly more reason for it than there was in *Ronney* v. *Robinson*. There a statute has given the Common Pleas jurisdiction in libel for divorce; but it has not made it a Court of record in any other aspect, than the one in which it had before been considered. Its proceedings in divorce are not according to the course of common law—at least where a feigned issue is not directed—and no writ of error lies to remove its sentence, whatever may be its power to remove the record of such an issue. In every other respect, the remedy is by appeal, as it is in the ecclesiastical Courts.

It may seem an arbitrary act to expunge a sentence of divorce with a stroke of the pen, bastardize after-begotten children, involve an innocent third person in legal guilt, and destroy rights acquired in reliance on a judicial act, which was operative at the time; and, under the first impression, I would have decided as did the judge at *Nisi Prius*. But the legitimate husband also has rights, and if any one must suffer from the invalid marriage, it is he who procured it. By the terms of the contract, he took the lady for better for worse, and having assumed at least her moral responsibilities, he stands, as to hardships, in her place. He, therefore, has no right to complain. The children, who are the fruit of the connection, are the only persons who have it, if indeed to have been brought into the world in any circumstances, can give such a right; but their condition is not worse than that of the dishonored husband. There is no injustice, therefore, in the proper exercise of the power assumed in this instance; and the apparent danger of excess in the use of it, vanishes when it is viewed in connection with a principle which requires the record to exhibit the ground of every judgment. Possibly there may have been no sufficient ground exhibited in this case; but even if there were not, the order to vacate would be only erroneous, and unimpeachable after the expiration of the period for reversing it by appeal. In stating, however, the charge of imposition, without the facts and circumstances to sustain it, the Court has perhaps stated enough to justify their action upon it. Confidence must be reposed in the wisdom and justice of the tribunals; and hence the maxim, that all things are presumed to have been rightfully done in Courts of record. The indorser of the note in suit before us, had no property in it, and the plaintiff has no title.

Judgment for plaintiff reversed, and judgment rendered for defendant.

NOTE B.—*McGiffert* v. *McGiffert*, in the Supreme Court of *New York*, as reported in the *Daily Times* newspaper.

The complaint in this cause is filed by the wife against the defendant, her husband, for a divorce *a vinculo matrimonii.*

The parties being residents of this state, were married here on the 12th of *September*, 1850. They lived together but a few weeks, and then separated.

In *January*, 1851, the defendant filed his complaint against the plaintiff, claiming to have the marriage annulled, on the alleged ground of the physical incapacity of the plaintiff to consummate the marriage. This she denied in her answer.

On the 28th of *April*, 1851, an order was made in that cause, requiring the plaintiff therein to pay Court fees and alimony to the defendant in that cause, and the same not having been paid, an order was made in that cause, on the 15th of *October*, 1851, staying all proceedings on the part of the plaintiff therein, until paid, and the proceedings therein have been stayed and suspended.

In *January*, 1852, the defendant went to the state of *Indiana*, leaving the plaintiff, his wife, in this state, where she has ever since remained. The defendant stated in his answer, that such residence in *Indiana* commenced on or about the 3d day of *January*, 1852, and that on the 10th day of *January*, 1853, being at that time a *bona fide* resident of that state, and having been for more than one year preceding said date, a resident of said state, he filed his bill against the plaintiff in this suit, for a divorce. On the 24th of *May*, 1853, the plaintiff in this suit not appearing, a decree of divorce was granted. In *October*, 1855, the defendant in this case returned to this state, accompanied by a woman to whom he had been married in *Indiana*, on the divorce granted there, with whom he has cohabited here. Upon these facts the complaint is filed, the plaintiff claiming that such intercourse of the defendant with the woman to whom he claims to be married, is adulterous, and entitles her to a divorce.

DAVIES, J.—I deem it unnecessary to discuss the many questions presented in this case. It appears to me that it must be disposed of on the authority of *Vischer* v. *Vischer*, 12 Barb. 643, and the authorities there referred to. The Court in *Indiana* never had jurisdiction of the plaintiff in this case, and the proceedings there as to her are void. As remarked by Justice HIND, in the case referred to, "It is a sound principle of law, as well as of natural justice, that no person should be bound by a judgment without being heard." And he cited a large number of cases to sustain this position. In this state, besides the case of *Vischer* v. *Vischer*, above cited, the same principle in reference to divorce was applied in the case of *Borden* v *Fitch*, 15 Johns. 121. In this case, the husband being in the state of *Vermont*, applied there, his wife then being in *Connecticut*, and never having been in *Vermont*, and having no notice of the proceeding for a divorce, which was granted. He came into this state and married another woman, his first wife being still living, and the case turned upon the effect of the divorce granted in the state of *Vermont*.

THOMPSON, C. J., in delivering the opinion of the Court, says, that it appeared from the testimony that the former wife never was in the state of *Vermont*, nor in any manner personally notified or apprised at the time of the proceedings in *Vermont* to obtain the divorce. She did not, in any manner, by her agent or attorney, appear or make any defense against such proceedings. A precisely similar state of facts is presented in the case now under consideration. The Chief Justice says: "The final question is, whether such proceedings in *Vermont* were not absolutely void. To sanction and give validity and effect to such a divorce, appears to me to be contrary to the first principles of justice. To give any binding effect to a judgment, it is essential that the Court should have jurisdiction of the person and of the subject-matter; and the want of jurisdiction is a matter that may always be set up against a judgment when sought to be enforced, or when any benefit is claimed under it; the want of jurisdiction makes it utterly void and unavailable for any purpose."

These positions are well sustained by authority and sound reasoning, and I have been unable to find any case where the force of this has been questioned. We have already seen that it was recognized as law in the case of *Vischer* v. *Vischer*, above referred to; and I feel no hesitation in saying that I am not at liberty to question the binding force of these authorities. They decide the precise point presented in this case, holding a decree obtained as this was to be utterly void, and unavailing for any purpose whatever. It therefore follows that it affords no legal justification for the defendant in cohabiting with any

other woman than the plaintiff, his lawful wife; and the facts of such cohabitation, and the other facts necessary to entitle the plaintiff to a divorce *a vinculo*, being clearly established, I have no choice but to direct a decree for a divorce. A reference may be had to settle the proper alimony to be paid to the plaintiff.